UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------
ROBERT ANTOINE,

Plaintiff,

- against -

MICHAEL LAROTONDA,

Defendant.

----------------------------------------------------------------

**OPINION & ORDER**

16-CV-6056 (CS)

<u>Appearances:</u>

Leo Glickman
Stoll, Glickman & Bellina, LLP
New York, New York
*Counsel for Plaintiff*

Irma W. Cosgriff
Westchester County Attorney's Office
White Plains, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

Before the Court is Defendant's motion for summary judgment.  (Doc. 83.)

I.      **BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 Statements, replies,

and supporting materials, and are undisputed except as noted.[1]

---

[1] Plaintiff's responsive 56.1 Statement, (Doc. 94 ("P's 56.1 Resp.")), fails to comply with item 2.C.i of my Individual Practices, which requires the opposing party to reproduce each entry in the moving party's Rule 56.1 Statement before setting out its response thereto.  Plaintiff's failure to reproduce the moving party's Rule 56.1 Statement defeats the purpose of my individual practice, which is designed to prevent the Court from having to go back and forth between the two Rule 56.1 Statements.  Furthermore, Plaintiff's response to Defendant's undisputed fact number twenty-four only makes sense if it was intended to be included as part of his response to Defendant's undisputed fact number twenty-three.

1

Plaintiff is the brother of Rahsi McClean,[2] a non-party in this case, who was charged with the attempted murder of K.W.,[3] among other things, in connection with a stabbing that occurred in Mount Vernon on August 4, 2013. (P's 56.1 Resp. ¶¶ 2, 11, 14.) On July 8, 2014, Plaintiff was arrested and charged with tampering with a witness in McClean's case, (id. ¶¶ 58-60), but on February 10, 2016, the witness tampering charge against Plaintiff was dismissed, (id. ¶ 64).

In 2014, Defendant was a criminal investigator at the Westchester County District Attorney's Office ("WCDAO") and was assigned to the major case unit where he assisted prosecutors with ongoing prosecutions and preparation for trials. (Id. ¶ 12.) All of Defendant's cases were assigned to him by prosecutors. (Id.) Plaintiff did not know Defendant or have any contact with or connection to him until Plaintiff's arrest on July 8, 2014. (Id. ¶ 13.)

McClean was indicted by a grand jury on charges of attempted murder in the second degree, attempted assault in the first degree, and assault in the second degree on or about November 25, 2013. (Id. ¶ 16.) The next day, he was arraigned and pleaded not guilty. (Id. ¶ 17.) McClean was incarcerated at the Westchester County Department of Correction, where Plaintiff visited him eleven times between December 1, 2013, and September 14, 2014. (Id.

---

[2] On December 3, 2018, the Court dismissed a separate lawsuit (relating to conduct not relevant to the instant litigation) that McClean had filed against Westchester County, Assistant District Attorney ("ADA") Jean Prisco, the City of Mount Vernon, and several of Mount Vernon's detectives and former detectives. *See McClean v. County of Westchester*, No. 17-CV-4492 (CS), 2018 WL 6329420, at *25 (S.D.N.Y. Dec. 3, 2018), *appeal docketed sub nom. McClean v. Westchester County*, No. 18-3836 (2d Cir. Dec. 26, 2018).

[3] The full names of the victim and witnesses are referenced herein by initials. A temporary order of protection was issued against Plaintiff on behalf of K.W., K.H., R.B., and two others on July 9, 2014, and Plaintiff did not attempt to have the order of protection against him vacated. (Cosgriff Decl. Ex. 21; *see* P's 56.1 Resp. ¶ 27.) A final order of protection was issued against McClean on behalf of K.W., K.H., R.B., and two others following McClean's sentencing on September 9, 2014. (P's 56.1 Resp. ¶¶ 25-26.)

¶ 18.) Pretrial hearings in McClean's case took place on June 17 and 24, 2014. (*Id.* ¶ 20.)[4] Jury

selection took place on June 25, 2014, and the trial was adjourned to July 7, 2014. (*Id.* ¶ 21.) At

some time in late June 2014, ADA Prisco assigned Defendant to assist in the prosecution of

McClean. (*Id.* ¶ 22.) The parties dispute why ADA Prisco assigned Defendant to McClean's

prosecution: Defendant asserts that he was assigned because the victim and witnesses advised

ADA Prisco that Plaintiff and McClean were intimidating them regarding their testimony, but

Plaintiff claims Defendant was investigating the stabbing. (*See* Doc. 85 ("Cosgriff Decl.")[5] Ex.

11 ("Defendant Tr.") at 92:5-17.)

During the leadup to McClean's trial, ADA Prisco came to believe that Plaintiff was

attempting to intimidate K.W. and other witnesses from testifying in McClean's case, (Cosgriff

Decl. Ex. 15 ("Prisco Tr.") at 25:8-11), based in part on conversations she had with K.W. (the

stabbing victim), R.B. (who Plaintiff and McClean called "Cuz" or Cuzo"),[6] and K.H. (K.W.'s

---

[4] Plaintiff's Local Rule 56.1 Response stated that "Plaintiff lacks sufficient knowledge to admit or deny this allegation. (P's 56.1 Resp. ¶ 20.) Such a response is insufficient to create a dispute. *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 605 (S.D.N.Y. 2013). Plaintiff had the opportunity to take discovery, and any properly supported facts in Defendant's 56.1 Statement that Plaintiff failed to properly address in his 56.1 Response are deemed undisputed. *See* Fed. R. Civ. P. 56(e)(2); *see also Scaprinato v. 1770 Inn, LLC*, No. 13-CV-955, 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015) (response that plaintiff "denies possessing knowledge or information sufficient to form a belief as to the truth or the veracity" is "flatly inappropriate" after discovery has concluded) (collecting cases).

[5] The Cosgriff Declaration was filed as both Documents 85 and 86. Document 87 is labeled as the Cosgriff Declaration too, but Document 87 is actually a transcript excerpt from ADA Prisco's deposition that took place on June 19, 2018.

[6] Plaintiff and R.B. were present when K.W. was stabbed, but both say they did not actually see the stabbing occur. (P's 56.1 Resp. ¶ 15; *see* Cosgriff Decl. Ex. 5 at 43:8-23 (Plaintiff testifying "I was there, yeah" but "I didn't see anything," including McClean stabbing K.W.); *id.* Ex. 13 at 1 (R.B. explaining, in his written statement provided on July 1, 2014, that he was with K.W. on the night of August 4, 2013, but that he "heard a fight behind [him]" and that K.W. told R.B. that McClean tried to stab him).)

girlfriend), (P's 56.1 Resp. ¶ 40; Prisco Tr. at 33:24-25). Toward the end of June 2014, according to ADA Prisco, K.H. told ADA Prisco that K.W. was scared of Plaintiff and that K.H. overheard a conversation during which R.B. had reached out to K.W. to relay a message from Plaintiff that K.W. should not testify and that if he did, he would have "beef in the streets." (Prisco Tr. at 32:12-36:17.) Defendant says this information was relayed to him, probably by ADA Prisco or her colleague. (Defendant Tr. at 60:15-62:17; *see* Prisco Tr. at 48:13-49:14 (summarizing evidence, including K.H. information, available to ADAs and WCDAO investigators prior to Plaintiff's arrest).) Plaintiff provided K.H.'s signed affidavit dated June 27, 2018, in which K.H. states that she "did not call anyone from any district attorney's office or any law enforcement agency" to say that R.B. had called her to relay a message from Plaintiff that K.W. should not testify against McClean, and that she has "never spoken to any law enforcement agent about [Plaintiff]." (Doc. 93 ("Glickman Decl.") Ex. K.) Defendant offered a subsequent affidavit signed by K.H. on July 27, 2018, (Cosgriff Decl. Ex. 22), in which K.H. avers that she was tricked into signing the June 27, 2018 affidavit by a private investigator (who denies that allegation, (*see* Glickman Decl. Ex. H at 1-2)), and that the statements in the earlier affidavit described above are inaccurate, (*id.* Ex. 22 ¶¶ 2-5, 7-9). Whether K.H.'s oddly worded initial affidavit in fact contradicts what ADA Prisco says is ultimately irrelevant to my decision, as discussed below.

On June 20, 2014, Plaintiff sent an Instagram message to R.B., which read, in part, "hit me bro asap" and included Plaintiff's phone number. (P's 56.1 Resp. ¶ 42; *see* (Doc. 89 ("D's 56.1 Stmt.") ¶ 33 n.10.) On or about June 30, 2014, Defendant went to a location in Mount Vernon where R.B. was living and left his business card for R.B. inside the door of the apartment. (P's 56.1 Resp. ¶ 43.) The next day, R.B. called Defendant at the phone number on

Defendant's business card and agreed to go to the WCDAO, which he did on July 1, 2014. (*Id.*) That day, R.B. gave a statement relating to the August 4, 2013 stabbing of K.W. (*Id.* ¶ 44; *see* Cosgriff Decl. Ex. 13.) R.B. told Defendant that Plaintiff reached out to R.B. on Instagram asking R.B. to call Plaintiff. (P's 56.1 Resp. ¶ 44.) Defendant told ADA Prisco about the July 1, 2014 conversation he had with R.B. at the WCDAO. (*Id.* ¶ 45.)[7] On or about July 5, 2014, Defendant spoke to R.B. again. (*Id.* ¶ 46.) Defendant testified that R.B. told Defendant that R.B. "was being called or Instagrammed or texted" by Plaintiff to tell R.B. to get "ahold of these people and tell them not to testify." (Defendant Tr. at 72:20-73:5.) R.B. also told Defendant that Plaintiff wanted R.B. to change his testimony and that Plaintiff did not want R.B. to testify against his brother. (*Id.* at 135:16-22.) Defendant told ADA Prisco about the July 5, 2014 conversation with R.B. (Prisco Tr. at 38:4-39:7.)

During preparations for McClean's trial, K.W. told ADA Prisco that he feared testifying against McClean and that he was scared for his family, including his child and girlfriend, because Plaintiff and the rest of Plaintiff's gang knew him and where he lived and they would retaliate against him and his family for testifying. (P's 56.1 Resp. ¶ 29; *see* Prisco Tr. at 24:10-17, 25:3-11.) K.W. never told ADA Prisco that Plaintiff specifically threatened K.W. or anyone else to prevent them from testifying. (Prisco Tr. at 28:18-23.) Defendant testified that "probably" on the same day that K.W. met with ADA Prisco, Defendant was advised that K.W. did not want to testify against McClean, that K.W. was afraid, and, in sum and substance, that K.H. said that Plaintiff wanted to get a message from R.B. to K.W. that K.W. should not show up

---

[7] Plaintiff's Local Rule 56.1 Response explained that "Plaintiff has no knowledge to admit or deny this allegation. (P's 56.1 Resp. ¶ 45.) I consider this fact undisputed. (*See supra* note 4.)

to testify or he would have "a beef."  (Defendant Tr. at 60:15-61:11, 61:23-62:17; *see* Prisco Tr. at 31:11-32:6.)

T-Mobile records received by ADA Prisco via subpoena on or about July 3, 2014, for the subscriber associated with Plaintiff's cell phone showed that:  (1) on July 1, 2014, three phone calls, each lasting under one minute, were placed from Plaintiff's cell phone to R.B.'s cell phone; (2) on July 2, 2014, seven text messages were exchanged between Plaintiff's cell phone and R.B.'s cell phone; and (3) on July 2, 2014, there were two telephone calls from Plaintiff's cell phone to R.B.'s cell phone, lasting five minutes and two minutes, respectively.  (P's 56.1 Resp. ¶ 33.)

Defendant also reviewed telephone calls placed from the Westchester County Jail to Plaintiff's landline.  (*Id.* ¶ 34.)  On June 19, 2014, at approximately 8:09 p.m., McClean and Plaintiff had the following exchange:

McClean:        Yo, you hollered at [C]uz [R.B.]?

Plaintiff:        I hit him on the gram but he don't hit me back.  I don't got no number for him . . . I got your letter too, you heard?  I'm on all of that, you heard . . . .

McClean:        See why I'm gonna need son, right?

Plaintiff:        Mmm hmm

McClean:        Yeah, so, tell that nigga man, get in contact with that nigga ASAP, man, please.  Try to do anything you can do to get that nigga's number, man.

Plaintiff:        Yeah, I got it, I'm on it . . . If I could, I don't know if I can remember though man, but I know what building he live in, you feel me?  I can't remember the door.  'Cause I went his crib before, I delivered that shit.  Word, I'm gonna find him, my nigga.  Don't worry about nothing.

(Cosgriff Decl. Ex. 12 ¶ 10.) Later in the conversation, Plaintiff and McClean had the following

exchange:

> Plaintiff: If he don't hit me back, I'm gonna try to find his crib. I know it's either the second or third floor . . . I go right there, you feel me? If he don't hit me back, I'm gonna hit him back. I'm, I'm gonna do it right now, I'm about to hit him again on the gram.
>
> McClean: Yeah my nigga, please. That nigga's important.
>
> Plaintiff: You say he's important?
>
> McClean: Hell yeah, bro?
>
> Plaintiff: He gotta come?
>
> McClean: Hell yeah!
>
> Plaintiff: I'm talking about, are they making him come?
>
> McClean: Nah bro[.] Man, I don't want to talk on the phone, man. That's why I'm tight I can't visit you. That's why I wanted someone else to come so they can tell you the message anyway, you feel me? You don't even know, once I tell you, you're gonna understand everything, man.
>
> Plaintiff: You said it in the letter though, right?
>
> McClean: Yeah.

(*Id.*) McClean also said, "Word, man Cuz is really important, man that's why I'm pissed. Word

man, you don't even know, man. Ah." (P's 56.1 Resp. ¶ 37.) There was also this exchange:

> McClean: Yo, fuckin keep working on Cuz and getting the number for him, and linking with him, and telling him what's the situation . . . .
>
> Plaintiff: I'll tell the nigga man, don't worry about nothing. If I see him, I tell him, and he's gonna come, you don't gotta worry about that. If he don't get back to me by today, I'll go up to his crib, ya feel me?

(*Id.* ¶ 38.) During the June 19, 2014 telephone conversation, Plaintiff patched in an

unidentified female. (*Id.* ¶ 39.) McClean told the female to come to the jail the following

Sunday (June 22, 2014) to see him and she agreed.  (*Id.* ¶¶ 39, 41.)  After the female

hung up the phone, McClean and Plaintiff had the following exchange:

McClean:        She gonna be for the same situation as Cuz[.]

Plaintiff:      Oh, alright.

McClean:        Yeah, you feel me?

Plaintiff:      Yeah, but, but I'm, I'm gonna try to get a couple people, you feel
                me?  Word, like, nigga, this is where you see where niggas at,
                you feel me?  You're gonna be alright, my nigga.  Niggas trying to
                get some, like official people though, not just anybody, you feel
                me?

McClean:        Nah bro, I'm this is, nigga, see I don't want to talk over this line
                man, niggas, you understand me, niggas was at the situation
                though, you feel me?  You don't, you don't remember.

Plaintiff:      Yeah, you gonna get a couple niggas like that, nigga trying get
                some other niggas too.  You not understanding what I'm saying
                though.

McClean:        Yeah man, please Porter,[8] I don't, I can't do nothing man, you just
                got, you feel me, you, you gotta control everything for me, man
                24/7 like.  You feel me bro?  You gotta control everything for
                me . . . you gotta control everything for me, my nigga, you feel
                me?  Facts, my nigga; you're all I got out there to control
                everything for me.  Nigga, I can't depend on nobody else to do
                anything.  Word my nigga, however, if I didn't have you out there,
                my nigga, I fucking be stressed out, my nigga[], I swear to God,
                bro.  That's the only reason I don't be stressed out, my nigga, word
                bro, that's the only reason I don't be stressed out too much.

Plaintiff:      You're gonna be alright man.  You feel me?  Don't worry about
                nothing, B.

(*Id.* ¶ 39.)

---

[8] "Porter" is a nickname for Plaintiff.  (D's 56.1 Stmt. ¶ 35 n.14.)

On July 4, 2014, Judge Susan Cacace signed a search warrant authorizing the search of Plaintiff's residence and person for cell phones and computers, as well as correspondence from McClean. (*Id.* ¶ 49; Cosgriff Decl. Ex. 29.) Judge Cacace issued the search warrant based upon an affidavit submitted by the WCDAO. (P's 56.1 Resp. ¶ 50.) The affidavit was drafted by ADA Prisco and signed by Defendant. (*Id.* ¶ 52.) On July 5, 2014, Defendant and others executed the search warrant, locating several[9] letters between Plaintiff and McClean. (*Id.* ¶ 54.) ADA Prisco and Defendant reviewed the seized letters, which included the following statements from McClean to Plaintiff: (1) "I need you to be on everything rite now. Focas up. Make sure you contact who you need to contact and get next to who you need to get next to"; (2) [G]et next to ya cousin r., he gon be my witness so I need you to make him come holla at me ASAP"; and (3) "You 'gotta do that footwork for me in the other situation and make sure son do the rite thing." (*Id.* ¶¶ 55, 61.)

On July 7, prior to the start of his trial, McClean pleaded guilty to assault in the second degree. (D's 56.1 Stmt. ¶ 24.)[10] Defendant signed a felony complaint dated July 8, 2014, charging Plaintiff with tampering with a witness in the third degree, and Plaintiff was arrested the same day. (P's 56.1 Resp. ¶¶ 58-60.) Specifically, Plaintiff was charged as follows:

> COUNT ONE: The Offense of TAMPERING WITH A WITNESS IN THE THIRD DEGREE, a violation of Penal Law PL2151101EF3

---

[9] Defendant claims that the search warrant located approximately ten such letters, (D's 56.1 Stmt. ¶ 54), but Plaintiff accurately notes, (P's 56.1 Resp. ¶ 54), that Defendant included duplicates in the cited exhibits, (*compare* Cosgriff Decl. Ex. 27 at 0027, *with id.* at 00267). Nonetheless, the number of letters between Plaintiff and McClean recovered by the search warrant is not a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and cannot preclude summary judgment).

[10] On September 9, 2014, McClean was sentenced to three years in state prison and two years of post-release supervision. (P's 56.1 Resp. ¶ 25.)

The Defendant at the above date, time and place [160 East Sidney, Mount Vernon, New York, on or about and between July 1, 2014 through July 7, 2014] did knowing that a person is about to be called as a witness in a criminal proceeding, wrongfully compel or attempt to compel such person to absent himself from, or otherwise to avoid or seek to avoid appearing or testifying at such proceeding by means of instilling in him a fear that the actor will cause physical injury to such person or another person.

To wit: The defendant at the above date, time and place, did attempt to wrongfully compel a person to absent himself from the trial of People of the State of New York v. Rahsi McClean, Westchester County Indictment Number 13-1450 by instilling in him a fear that the actor will cause physical injury to such person or another person.

(Cosgriff Decl. Ex. 30.)

Following Plaintiff's arrest, Facebook and social media posts were recovered and reviewed by Defendant. (P's 56.1 Resp. ¶¶ 57, 62.) One post that Plaintiff authored after McClean pleaded guilty included a picture of K.W. and said, "This faggot Niger by the name of [K.W.] with the help of [R.B.] put my brother young [Z]immy away for 3 fucking ye[ar]s these 2dudes are certified RATS." (*See* Cosgriff Decl. Ex. 28 at 286; *id.* Ex. 5 at 64:24-66:3.)[11] Another post Plaintiff wrote the day he was arrested said, "The crazy thing E that bitch Niger [R.B.] our fake family that Michael Cole burn big brother." (Cosgriff Decl. Ex. 28 at 287; *id.* Ex. 5 at 69:11-25.) Commenters' responses included, "Nigger need to get shot" and "[T]hat's right bro pu[t] these rat bastards on blast." (Cosgriff Decl. Ex. 28 at 287.)

In connection with his arrest, Plaintiff spent six days in custody. (P's 56.1 Resp. ¶ 63.) The witness tampering charge against Plaintiff was dismissed on February 10, 2016. (D's 56.1 Stmt. ¶ 64.)

---

[11] "Zimmy" is McClean's nickname. (*See, e.g.*, Cosgriff Decl. Ex. 13 at 1 (R.B. referring to McClean as "Zimmy.").)

On July 29, 2016, Plaintiff filed a complaint, (Doc. 1), which he amended on January 30, 2017, (Doc. 29 ("FAC")).  Following discovery, Defendant filed the instant motion for summary judgment.  (Doc. 83.)

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

### A.    False Arrest

Plaintiff alleges that Defendant's signing of the July 8, 2014 felony complaint for the charge of tampering with a witness led to Plaintiff's false arrest.[12] False arrest claims are analyzed under the law of the state in which the arrest occurred. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). Under New York law, to prevail on a false arrest claim, a plaintiff

---

[12] Defendant states – perhaps based on the FAC's references to unreasonable search and seizure, (FAC ¶¶ 25, 27, 31) – that Plaintiff's claims against Defendant are also based on Defendant's signing of the affidavit in support of the search warrant dated July 4, 2014. (Doc. 88 ("D's Mem.") at 7.) In response, Plaintiff said that this suggestion is "an invented cause of action" and that Defendant's execution of the search warrant was not part of his lawsuit. (P's Opp. at 3.) Plaintiff did not include any cause of action for unreasonable search and seizure beyond false arrest, and he has disavowed any intent to advance a claim based on the search warrant, so I do not address the search.

must demonstrate that (1) the defendant intentionally confined him, (2) the plaintiff was aware of being confined, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not justified or otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003).

An arrest is justified or privileged if it is based on probable cause. *LaFontaine v. City of N.Y.*, No. 08-CV-1555, 2009 WL 3335362, at *5 (S.D.N.Y. Oct. 14, 2009); *see Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Probable cause exists when an officer has "'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Jocks*, 316 F.3d at 135 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "[P]robable cause is evaluated under an objective standard," *Michaels v. City of N.Y.*, No. 10-CV-2666, 2011 WL 570125, at *5 (S.D.N.Y. Feb. 16, 2011) (internal quotation marks omitted), under which "courts look to the information available to the law enforcement officer at the time of the arrest and consider the 'totality of the circumstances,'" *id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *accord Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Because probable cause is evaluated under an objective standard, it need not be "predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer," and "the 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The focus is simply on "the validity of the *arrest*, and not on the validity of each charge." *Id.* at 154 (emphasis in original). In other words,

if Defendant had probable cause to arrest Plaintiff for any crime, the arrest was privileged and cannot form the basis of a false arrest claim under 42 U.S.C. § 1983.

Here, the undisputed evidence shows that there was probable cause to arrest Plaintiff. K.W. and K.H. both told ADA Prisco that K.W. was scared to testify at McClean's trial. K.W. told ADA Prisco that he feared testifying against McClean and that he was scared for his family, including his child and girlfriend, because Plaintiff and the rest of Plaintiff's gang knew him and where he lived and they would retaliate against him and his family for testifying. While K.W.'s fear of retaliation by Plaintiff, even if well founded, would not alone justify a criminal charge, there was more. ADA Prisco told Defendant that K.H. overheard a conversation during which R.B. had reached out to K.W. to relay a message from Plaintiff that K.W. should not testify and that if he did, he would have "beef in the streets." Additionally, R.B. told Defendant that R.B. "was being called or Instagrammed or texted" by Plaintiff to tell R.B. to get "ahold of these people and tell them not to testify," and that Plaintiff had attempted to intimidate him into not testifying against McClean. Phone records maintained by T-Mobile corroborated that Plaintiff contacted R.B. in the days leading up to McClean's trial. Defendant also reviewed recorded jail telephone calls between Plaintiff and McClean from June 19, 2014, during which McClean pleaded with Plaintiff to get in touch with R.B. because he was so important, urging Plaintiff not to speak on the phone about "the situation," and telling him that he was the "only one who can get to those people." McClean also said "Cuz is really important" and that Plaintiff "had to control everything."

The July 4, 2014 search warrant – drafted by ADA Prisco, signed by Defendant, issued by the Court, and executed by Defendant – uncovered letters between Plaintiff and McClean which provided additional evidence. McClean told Plaintiff "I need you to be on everything rite

now.  Focas up" and "You gotta do that footwork for me in the other situation and make sure son

do the rite thing."  Based on the information possessed by Defendant at the time Defendant

signed the felony complaint, there was ample probable cause to arrest Plaintiff for witness

tampering in the third degree or conspiracy to commit that offense.[13]

Plaintiff spends much of his opposition memorandum arguing that he only contacted R.B.

because Plaintiff and McClean thought R.B. would be a helpful witness to McClean.  (Doc. 92

("P's Opp.") at 6-11.)  Plaintiff testified that "R.B. was, like, one of our best witnesses, because

the lawyer say . . . he never got arrested really.  He ain't had no felonies, character-wise."

(Glickman Decl. Ex. B at 70:7-11.)  Even assuming Plaintiff's argument – perhaps based on

McClean writing to Plaintiff to "get next to ya cousin r., he gon be my witness so I need you to

make him come holla at me ASAP" – is correct, Defendant still had probable cause to arrest

Plaintiff.  "Probable cause does not necessarily disappear simply because an innocent

explanation may be consistent with facts that an officer views as suspicious."  *Figueroa v.*

*Mazza*, 825 F.3d 89, 102 (2d Cir. 2016) (internal quotation marks omitted).  Once a law

---

[13] New York Penal Law Section 215.11 provides:

A person is guilty of tampering with a witness in the third degree when, knowing that a person is about to be called as a witness in a criminal proceeding:

> 1. He wrongfully compels or attempts to compel such person to absent himself from, or otherwise to avoid or seek to avoid appearing or testifying at such proceeding by means of instilling in him a fear that the actor will cause physical injury to such person or another person; or
>
> 2. He wrongfully compels or attempts to compel such person to swear falsely by means of instilling in him a fear that the actor will cause physical injury to such person or another person.

N.Y. Penal Law § 215.11.

enforcement officer "has a reasonable basis for believing there is probable cause" to arrest a suspect, "he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *see Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) (law enforcement officers are tasked with "apprehend[ing] those suspected of wrongdoing" – not engaging in "a weighing of the evidence"). Given the totality of the facts and circumstances, and construing the evidence in a light most favorable to Plaintiff, there was ample evidence (including R.B.'s perception that Plaintiff was trying to get him not to testify and to persuade others not to do so) indicating that Plaintiff and McClean did not want R.B. to testify at McClean's trial. Plaintiff's attempts to argue that there is no evidence that Plaintiff intimidated R.B., (P's Opp. at 15-18), is belied by the record, but even if it were true, there would still be probable cause that Plaintiff committed witness tampering in the fourth degree, which does not require intimidation, *see* N.Y. Penal Law § 215.10, and that Plaintiff attempted to intimidate K.W. into not testifying.

Plaintiff argues that the contacts between Plaintiff and K.H. and between K.H. and the WCDAO are disputed. (P's Opp. at 12-15.) Even if so, there is no similar dispute about what Defendant was told. It is undisputed that Defendant learned from an ADA that K.H. had said that she overheard R.B. conveying to K.W. that Plaintiff had threatened to harm K.W. if K.W. testified. The record contains no evidence suggesting that Defendant had or should have had any reason to doubt what the ADA told him. Indeed, it was corroborated by R.B.'s statement that Plaintiff was trying to get R.B. to get others not to testify and by K.W.'s fear of Plaintiff and his fellow gang members. Therefore, any fact dispute about what K.H. told ADA Prisco does not create a fact dispute about what ADA Prisco told Defendant, and it is the latter that matters. *See Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (*per curiam*) (inquiry turns on

16

facts known to arresting officer at the time); *Hoyos v. City of N.Y.*, 999 F. Supp. 2d 375, 386 (E.D.N.Y. 2013) (officer entitled to rely on information in fellow officer's report).[14]

Plaintiff's counsel further contends that Defendant did not help Plaintiff secure depositions of K.H. and R.B. in this litigation and that despite Plaintiff having served them with subpoenas, "either [Defendant] or others on his behalf appeared to have discouraged witnesses [*sic*] testifying." (P's Opp. at 12; *see id.* at 12-14.) Plaintiff's allegation that Defendant or someone acting on his behalf discouraged witnesses from testifying has no record support.[15] As to Plaintiff's other complaint, I know of no obligation on a defendant's part to help the plaintiff's counsel secure a witness's deposition. And there are remedies Plaintiff's counsel could have pursued if a witness failed to comply with a subpoena – including contempt under Federal Rule of Civil Procedure 45 ("The court for the district where compliance is required . . . may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it."). Fed. R. Civ. P. 45(g). I will not speculate about what K.H. or R.B. might have said had Plaintiff's counsel taken their depositions. Instead, I look to the record and

---

[14] In any event, even without the information from K.H. that Defendant got from ADA Prisco, the remaining evidence provided arguable probable cause at the very least. *See Figueroa*, 825 F.3d at 100 (in false arrest context, "an arresting officer is entitled to qualified immunity so long as arguable probable cause was present when the arrest was made") (internal quotation marks omitted). "A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotation marks omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Id.* (internal quotation marks omitted).

[15] The closest Plaintiff comes is his citation to his notes of a conversation with Defendant's counsel in which Defendant's counsel reported that K.H. had said she had not gotten a subpoena and in which Defendant's counsel declined to call K.H. to ask her to appear. (P's Opp. at 13-14; *see* Glickman Decl. Ex. F.) Plaintiff's counsel ought to know that this provides no basis to accuse anyone of misconduct.

find that Defendant objectively possessed enough knowledge or reasonably trustworthy information to arrest Plaintiff for witness tampering. Accordingly, Defendant's motion for summary judgment on Plaintiff's false arrest claim is granted.

### B. Malicious Prosecution

As with Plaintiff's false arrest claim, Plaintiff's malicious prosecution claim is analyzed under New York law. *See Manganiello v. City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010); *Perez v. Duran*, No. 11-CV-5399, 2013 WL 3357166, at *6 (S.D.N.Y. July 3, 2013). A claim for malicious prosecution under New York law requires a plaintiff to prove: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 161 (internal quotation marks omitted). A claim for malicious prosecution under § 1983 also requires that the plaintiff establish "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

As with false arrest claims, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York," *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003), but unlike false arrest claims, the defendant must have possessed probable cause as to each offense charged, *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991). "In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (internal quotation marks omitted). Therefore, "the existence, or

lack, of probable cause is measured as of the time the judicial proceeding is commenced (*e.g.*, the time of the arraignment), not the time of the . . . arrest." *Morgan v. Nassau County*, No. 03-CV-5109, 2009 WL 2882823, at *10 (E.D.N.Y. Sept. 2, 2009) (internal quotation marks omitted). "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined 'by the discovery of some intervening fact.'" *Johnson v. Constantellis*, 221 F. App'x 48, 50 (2d Cir. 2007) (summary order) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003)).

Even if I assume that Plaintiff has sufficiently established a factual dispute about whether Plaintiff's tampering case terminated in Plaintiff's favor,[16] and even if I assume Plaintiff has

---

[16] In a footnote, Defendant offers a cursory argument that because Plaintiff was charged with witness tampering, it is "not surprising that his criminal case was dismissed when witnesses failed to appear" and that "an argument can be made that [Plaintiff's criminal case] was not dismissed in his favor." (D's Mem. at 15 n.10.) I would be on firm ground were I to disregard a contention Defendant suggests "can be made" as insufficiently argued. *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived . . . ."); *Levine v. Lawrence*, No. 03-CV-1694, 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[F]ailure to adequately brief an argument constitutes waiver of that argument . . . ."). But Defendant's argument fails anyway because he offers no evidence that Plaintiff's case was dismissed because witnesses failed to appear and because he has only offered evidence of Plaintiff's misconduct in McClean's case, not his own. Defendant's reply memorandum attempts to clarify Defendant's favorable-disposition argument, explaining that Plaintiff cannot show that his case was favorably terminated simply by showing it was dismissed, citing a case saying that the dismissal of a criminal case on speedy trial grounds is not a favorable termination, because it does not affirmatively indicate Plaintiff's innocence. (Doc. 91 ("D's Reply") at 9 (citing *Thompson v. City of N.Y.*, No. 17-CV-3064, 2019 WL 162662, at *4 (S.D.N.Y. Jan. 10, 2019).) Neither party has bothered to provide any evidence as to why the charge against Plaintiff was dismissed. Nor has either side mentioned *Lanning v. City of Glens Falls*, 908 F.3d 19 (2d Cir. 2018), which was decided before Plaintiff's opposition and Defendant's reply briefs were due. In that case, the Second Circuit held that for purposes of a § 1983 malicious prosecution case, a termination is not favorable unless the disposition carries "affirmative indications of innocence." *Id.* at 25. That is, a termination is not favorable if it "leaves the question of guilt or innocence unanswered." *Id.* at 28 (internal quotation marks omitted). Defendant in reply has argued that Plaintiff has not provided evidence of a favorable termination simply by stating that his case was dismissed. (D's Reply at 9.) Had Defendant made that argument in the first instance, it might well have prevailed, as the law permits the party moving for summary judgment to meet its initial burden by "pointing out to the district

demonstrated a fact dispute about whether Defendant's actions were motivated by actual

malice,[17] Plaintiff's malicious prosecution claim would fail for the same reason his false arrest

claim failed: Defendant had ample probable cause to initiate the prosecution against Plaintiff

(and at the very least had arguable probable cause).[18] Although "[t]he determination of probable

cause to prosecute is distinct from probable cause to arrest," *Sankar v. City of N.Y.*, 867 F. Supp.

2d 297, 311 (E.D.N.Y. 2012) (emphasis omitted), *reconsideration denied*, No. 07-CV-4726,

2012 WL 2923236 (E.D.N.Y. July 18, 2012), here, the facts giving rise to both are identical.

The Second Circuit has explained that "evidence could later surface which would eliminate that

---

court [] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. That would have shifted the burden to Plaintiff to show that the termination of his case was indicative of innocence. But to the extent Plaintiff's favorable-termination argument was developed at all, it was in reply. Plaintiff did not have an opportunity to respond to it, and I thus will not consider it. *See Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 648 n.9 (S.D.N.Y. 2011) ("[A] court need not consider arguments raised for the first time in a party's reply brief.") (internal quotation marks and alterations omitted), *on reconsideration*, 2011 WL 5121068 (S.D.N.Y. Oct. 28, 2011).

[17] In another footnote, Defendant argues that there is no evidence of malice. (D's Mem. at 15 n.11.) While a "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment," *Ricciuti*, 124 F.3d at 131, there was probable cause here. And there is nothing else to suggest Defendant harbored any malice toward Plaintiff. Plaintiff's argument that malice can be inferred from Defendant not wanting Plaintiff to gather evidence favorable to McClean is speculative and illogical, given that Plaintiff was not arrested until after McClean had pleaded guilty.

[18] Even if Defendant did not possess probable cause to charge Plaintiff with witness tampering in the third degree, he would be entitled to qualified immunity because the facts support a finding of arguable probable cause. *See Jean v. Montina*, 412 F. App'x 352, 354 (2d Cir. 2011) (summary order) (defendant entitled to qualified immunity from malicious prosecution if facts supported arguable probable cause to charge, which "exists where, accounting for any new information learned subsequent to an arrest, 'it was not manifestly unreasonable for [the defendant officer] to charge [the plaintiff]' with the crime in question") (alterations in original) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996)). On these facts, it cannot be said that Defendant's "judgment was so flawed that no reasonable officer would have made a similar choice," *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995), and so Defendant would be entitled to qualified immunity even if he lacked probable cause to charge.

probable cause," but for the probable cause that existed at the time of arrest to "dissipate" prior to commencement of the prosecution, the "groundless nature of the charge must be made apparent by the discovery of some intervening fact." *Kinzer*, 316 F.3d at 144 (internal quotation marks omitted). Plaintiff has not pointed to any intervening fact or evidence uncovered after the arrest that would suggest that prosecuting Plaintiff for witness tampering was "groundless." Nor has he pointed to any evidence that investigators possessed prior to the arrest but failed to examine further. *See Weiner v. McKeefery*, 90 F. Supp. 3d 17, 34-35 (E.D.N.Y. 2015). If anything, the prosecution against Plaintiff became stronger following his arrest, given the Facebook and social media posts that were recovered and reviewed by Defendant – which clearly demonstrate that Plaintiff did not regard R.B. or K.W. as good witnesses for McClean and seem designed to create a "beef in the streets." Because Plaintiff puts forth no evidence as to how the probable cause that supported his arrest had dissipated or otherwise indicating that Defendant should have concluded that the witness tampering charge was groundless, Defendant's motion for summary judgment as to his malicious prosecution claim is granted.[19]

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 83), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: July 25, 2019
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[19] Defendant contends that he is entitled to absolute immunity. (D's Mem. at 7-10.) I need not reach that issue here.